**UNITED STATES of America, Plaintiff,**

v.

**Avery BARBER, Defendant.**

**Crim. No. 90–316 (AJL).**

United States District Court,
D. New Jersey.

Nov. 9, 1992.

Marion Percell, Robert Mintz, Asst. U.S. Attys., U.S. Attorney's Office, Newark, NJ, for plaintiff.

W. Gary Kohlman, Kohlman and Rochon, Washington, DC, for defendant.

## OPINION

LECHNER, District Judge.

Currently before the court is the motion of Avery Barber ("Barber") for a new trial on the ground that he was denied his Sixth Amendment right to the effective assistance of counsel.[1] For the reasons that follow, the motion for a new trial is denied.

*Facts*

On 20 July 1990, Barber was indicted for conspiring to distribute heroin in violation of 21 U.S.C. § 846. Indictment, dated 20 July 1990 (the "Indictment"); *United States v. Barber*, Crim. No. 90–316 at 2 (D.N.J., filed 16 October 1990) (the "Suppression Opinion"). According to the Indictment, the conspiracy existed between 1 October 1989 and 27 June 1990. Indictment, ¶ 1.

After a three day trial, Barber was convicted and sentenced to one hundred sixty-five months imprisonment to be followed by five years of supervised release. Transcript of Proceedings, dated 11 October 1990 (the "Trial Tr."), at 328; Transcript of Sentencing Proceedings, dated 8 January 1991 (the "Sentencing Tr."), at 13–14; Judgment, filed 8 January 1991 (the "Judgment"). Barber appealed and the Third Circuit affirmed his conviction in all respects (the "Appeal"). *United States v. Barber*, 935 F.2d 1282 (3d Cir.1991) (the "Appellate Decision"). Barber then filed a petition for a Writ of Certiorari to the United States Supreme Court, which petition was denied. Barber Aff., ¶ 8.

### A. Pre–Trial Representation

On 8 August 1990, Steven D. Altman, Esq. ("Altman") filed a Notice of Appearance in this court on behalf of Barber. Docket Sheet, Crim. No. 90–316, certified on 24 March 1991, at 2 (the "Docket Sheet"). On 20 August 1990, Altman notified the court that he had not been retained to represent Barber and that he had "forward[ed] all the documents provided to [him] to the attorney of [Barber]'s choice, Burt Pugach, Esq, [ ("Pugach") ] of Forest Hills, New York." Letter from Altman, dated 20 August 1990.

Although Barber asserts Pugach made an appearance in this court on behalf of Barber, Barber Aff., ¶ 3, *the record is devoid of any such appearance.*[2] *See* Dock-

---

1. In support of Barber's motion for a new trial, Barber has submitted the following: Memorandum in Support of Defendant's Motion for a New Trial (the "Moving Brief") and Affidavit of Avery Barber (the "Barber Aff."). Barber has not submitted a reply brief.

 In opposition to Barber's motion for a new trial, the Government has submitted the following: Response of the Government to Defendant's Section 2255 Motion (the "Opp. Brief"); Affidavit of Robert A. Schutzman (the "Schutzman Aff.") (attached as Exhibit A to Opp. Brief); Affidavit of John Dougherty (the "Dougherty Aff.") (attached as Exhibit B to Opp. Brief).

 On 16 October 1992, a full evidentiary hearing (the "Hearing for a New Trial") was held. *See* Transcript of Proceedings, dated 16 October 1992 (the "New Trial Hrg. Tr.").

2. During the Hearing For a New Trial, Barber submitted a copy of the inside cover of the court clerk's file which lists "Burton Pougach, Esq." as an attorney in the case. New Trial Hrg. Tr. at 4 & Defendant's Ex. 3 ("D3"). This entry which, significantly, was crossed out by the clerk, is neither part of the record nor can it be explained. No appearance by Pugach is recorded on the Docket Sheet, *see* Docket Sheet, or in any of the minutes or transcripts of proceedings in this case prior to trial, during trial or after trial. Pugach's name also fails to appear on a single written document submitted in this case. In fact, at the Hearing For a New Trial, Barber's attorney, W. Gary Kohlman, Esq. ("Kohlman") conceded that Pugach's name appears nowhere in the official record of the court. New Trial Hrg. Tr. at 5, 111.

et Sheet. No appearance by Pugach is recorded in any of the pretrial or trial minutes or transcripts of proceedings, nor does Pugach's name appear on any of the written submissions in the case. Pugach, in fact, was not a lawyer. Barber Aff, ¶ 9; Schutzman Aff., ¶¶ 2–3. Pugach was a paralegal hired by Schutzman on a freelance basis. Schutzman Aff., ¶¶ 2–3; New Trial Hrg.Tr. at 61. As indicated below, it was Schutzman who represented Barber throughout this matter.[3] Schutzman Aff, ¶¶ 2–9; Dougherty Aff., ¶¶ 3–8. Schutzman has confirmed that Pugach never appeared in court on behalf of Barber.[4] New Trial Hrg.Tr. at 66.

Barber's girlfriend, Mia Crockett ("Crockett") testified at the New Trial Hearing that, in August 1990, she hired Pugach to represent Barber.[5] Id. at 9. According to Crockett, Pugach told her he was an attorney, he had been practicing law "for quite awhile" and he specialized in criminal cases.[6] Id. at 9–10. Crockett also testified she paid a retainer fee totalling thirteen thousand dollars directly to Pu-

gach, in the form of two cashier's checks payable to Pugach.[7] Id. at 10–12.

Barber and Crockett have further contended that, prior to trial, the only discussions they had concerning Barber's case were with Pugach. New Trial Hrg.Tr. at 12–13, 15, 25; Barber Aff., ¶ 4. Barber has also contended his discussions with Pugach occurred entirely by telephone.[8] Barber Aff., ¶ 4; New Trial Hrg.Tr. at 24. According to Barber and Crockett, they and Barber's family believed Pugach to be a licensed attorney and they believed they had hired Pugach to represent Barber. Barber Aff., ¶ 2; New Trial Hrg.Tr. at 13, 23. Barber has asserted Pugach actually told him over the telephone that Pugach was an attorney and would represent him. Barber Aff., ¶ 3.

Barber has contended that, in his discussions with Pugach, Pugach never brought up the possibility of entering a guilty plea and repeatedly assured Barber that he would be acquitted at trial. Id., ¶ 4. Barber has asserted he informed Pugach he

It is similarly strange that, directly above Pugach's name, the file cover lists "Elizabeth Smith, Esq." as an attorney in this case. Id. at 4 & D3. As with Pugach, Smith's name does not appear on a single record or document in the case. Nor has Barber ever mentioned any representation by Smith. At some point Smith's name, like Pugach's, was crossed out by the clerk. The only defense attorney's name that remains intact on the inside cover of the clerk's file is that of Robert Schutzman, Esq. ("Schutzman"). Id.

3. Schutzman has stated he is an attorney-at-law licensed to practice in the states of New York and Pennsylvania and that he has been admitted to the New York bar for twenty-one years. Schutzman Aff., ¶ 1. Barber has not contested Schutzman's qualifications. Barber Aff., ¶¶ 1–7; Moving Brief at 5.

4. Schutzman has acknowledged that, when he engaged Pugach to perform paralegal services, he knew Pugach was a disbarred attorney, who had spent fourteen years in prison for throwing lye in the face of his girlfriend (now wife). New Trial Hrg. Tr. at 78. Schutzman also testified that, prior to hiring Pugach, he had seen a letter from Pugach's sentencing judge stating that Pugach had been a practicing paralegal for more than ten years since his release from prison and recommending that Pugach be re-admitted to the New York bar. Id.

5. As Barber's girlfriend, Crockett is an interested witness and her testimony was weighed and considered accordingly.

6. Barber testified he was told by Pugach that Pugach specialized in "drug conspirac[y]" cases. New Trial Hrg. Tr. at 30.

7. Copies of the two cashier's checks were admitted into evidence at the Hearing For a New Trial as Defendant's Exhibits One and Two ("D1" and "D2"). D1 is a cashier's check drawn on the First American Bank of Maryland, in the amount of six thousand dollars. See D1. While Crockett claimed this check was made payable to Pugach, the copy quality of D1 is poor and the payee's name cannot be identified. See id. D2 is a cashier's check drawn on the American Security Bank in Washington, D.C., in the amount of seven thousand dollars. See D2. D2 clearly identifies Pugach as the payee. See id. Crockett testified that both D1 and D2 were endorsed and cashed by Pugach. New Trial Hrg. Tr. at 12. While the endorsing signatures on both checks are illegible, the same signature appears on the back of both D1 and D2. See D1 and D2; see also infra at n. 51 (discussing significance of these checks).

8. Barber testified at the New Trial Hearing that his phone conversations with Pugach occurred once or twice weekly from early August 1990 to the trial. New Trial Hrg. Tr. at 24.

wanted two persons to be called as witnesses on his behalf—Michael Barber, his brother, and Warren Gore ("Gore"), his co-conspirator—and Pugach assured Barber the witnesses would be interviewed and would be available at trial. *Id.*

Regarding Schutzman, Barber stated:

Schutzman never visited me once in jail before trial. He did appear in court with me before trial, but always, I thought as a substitute for Pugach. I did not know until the trial began that Schutzman and not Pugach would represent me at the trial.... I never had a single discussion with Schutzman about my case. I never discussed with him the possibility of resolving my case with a disposition.[9]

*Id.*, ¶¶ 5–6; *see also* New Trial Hrg.Tr. at 25, 29–31. Barber and Crockett have both contended they were told by Pugach that Pugach and not Schutzman would represent Barber on appeal, and that Pugach did all the work on appeal.[10] Barber Aff., ¶ 7; New Trial Hrg.Tr. at 14, 31.

Schutzman's version of the facts is significantly different. According to Schutzman, he was hired by Barber's family to represent Barber. Schutzman Aff., ¶ 2. Schutzman stated that Crockett encountered difficulty contacting him and that she was told she could reach him through Pugach. *Id.;* New Trial Hrg.Tr. at 60. It was for this reason that Pugach was contacted in the first place. Schutzman Aff., ¶ 2; New Trial Hrg.Tr. at 60.

Schutzman has further asserted he met with Crockett for the first time in Pugach's office.[11] Schutzman Aff., ¶ 3. Crockett confirmed this meeting. New Trial Hrg. Tr. at 16. During this meeting, Schutzman informed Crockett that Pugach was a paralegal "who would write the motions and other written work, while [Schutzman] was the attorney who would represent Barber in court and at trial."[12] Schutzman Aff., ¶ 2; New Trial Hrg.Tr. at 63, 98. Crockett was given Pugach's business card, indicating Pugach was a self-employed paralegal, to be used in the event Schutzman could not be reached directly.[13] Schutzman Aff., ¶ 2; *see also* New Trial Hrg.Tr. at 99 & Ex. G1. Crockett was also given Schutzman's card, indicating that Schutzman was a licensed attorney. New Trial Hrg.Tr. at 64, 99.

According to Schutzman, Schutzman was paid a retainer by Crockett at that time. Schutzman Aff., ¶ 2. Schutzman also testified at the Hearing for a New Trial that he paid Pugach. New Trial Hrg.Tr. at 75–76. Regarding the cashier's checks made payable by Crockett to Pugach, Schutzman testified:

---

**9.** Barber's testimony at the Hearing For a New Trial was similar: "Me and Mr. Schutzman never talked, only two or three times in the courthouse itself, never interviews or anything like that." New Trial Hrg. Tr. at 31; *see also id.* at 44.

Significantly, the testimony of Barber and Crockett, as well as the written submissions of Barber, consistently use the word "never" when discussing Barber's interaction with Schutzman. By itself, the frequency with which the word "never" is used is suspect. In addition, the record, particularly Barber's own statements, simply do not support these exaggerated statements. *See infra* at pp. 373–76 & n. 44.

**10.** Schutzman represented Barber on appeal, both on the brief and at oral argument. New Trial Hrg. Tr. at 14–15 & Defendant's Ex. 5 ("D5") (copy of appellate brief).

**11.** According to Schutzman, the meeting took place in Pugach's office because, at that time, Schutzman was using space in another lawyer's office and did not have an office of his own. New Trial Hrg. Tr. at 63.

**12.** During the Hearing for a New Trial, Schutzman repeatedly emphasized that, while Pugach would do the "paperwork" in Barber's case, no documents would be signed by Schutzman or filed with the court without first being reviewed by Schutzman. New Trial Hrg. Tr. at 62–63, 96–97. For instance, the New Trial Hearing Transcript states:

Q [by Kohlman]. [I]n this particular case ... you did rely upon Mr. Pugach's written work?

A [by Schutzman]. Of course not. I can't rely on his work, counsel. I can accept his papers, look at it and then check it and if I believe its correct, use it. If not, no. You do that with any paralegal.

*Id.* at 80.

**13.** Crockett denied being told Pugach was a paralegal. New Trial Hrg. Tr. at 16. Nevertheless, Pugach's business card, submitted as Government's Exhibit One ("G1") at the Hearing for a New Trial, states that Pugach provides "[p]ara[l]egal [s]ervices." *See* G1.

Pugach told me that he had gotten some checks from [the Barber family] that were made out to him. . . . He said that he didn't know why they made it out in his name. I said, "You have to cash it and then give me either the cash or your check for it," which he [Pugach] did.

*Id.* at 76; *see also id.* at 87–88.

From this point on, much of Schutzman's account is confirmed by the record in this case. Schutzman stated he first met Barber on the occasion of Barber's arraignment [14] (the "Arraignment").[15] Schutzman Aff., ¶ 2; New Trial Hrg.Tr. at 64. The Arraignment occurred on 8 August 1990; a plea of "not guilty" was entered by Barber. Schutzman Aff., ¶ 2; Minutes of Proceedings, dated 8 August 1990, filed 8 August 1990 (the "Arraignment Min."); Docket Sheet at 2. On this occasion, Schutzman stated he discussed the case with Barber in Barber's holding cell in the United States courthouse in Newark, New Jersey.[16] Schutzman Aff., ¶ 2; New Trial Hrg.Tr. at 65. According to Schutzman, he and Barber discussed the possibility of Barber making bail, as well as the fact that Schutzman would be filing motions on Barber's behalf. New Trial Hrg.Tr. at 65. Barber has conceded he and Schutzman discussed Barber's bail situation. *Id.* at 33–34.

On 13 August 1990, Schutzman appeared on behalf of Barber at the Bail Hearing held before Magistrate Judge G. Donald Haneke ("Magistrate Judge Haneke"). Minutes of Proceedings, dated 13 August 1990, filed 16 August 1990 (the "Bail Hrg. Min."); Docket Sheet at 2. Barber was ordered detained without bail pending trial. Bail Hrg.Min.; Docket Sheet at 2. On the

same day, Schutzman served detailed discovery requests and a bill of particulars on the Government. Opp. Brief, Ex. C.

On 31 August 1990, Schutzman filed a motion on behalf of Barber (the "Suppression Motion"), and a fourteen page affirmation signed under penalty of perjury by Schutzman. Docket Sheet at 2; Affirmation of Robert Schutzman, filed 31 August 1992 (the "Schutzman Affirm."); Suppression Opinion at 1 n. 1. The Suppression Motion sought: (1) a full evidentiary hearing to suppress evidence against Barber obtained from a wiretap of his conversations and any out-of-court identifications of Barber and (2) discovery of photographs used in connection with Barber's identification. Schutzman Affirm.; Suppression Opinion at 1 n. 1.

On 14 September 1990, Schutzman appeared in court on behalf of Barber at a status conference (the "Status Conference") to discuss the Suppression Motion. Transcript of Proceedings, dated 14 September 1990, at 1 (the "Status Conf.Tr."). During the Status Conference, Schutzman consistently argued for a trial date later than 1 October 1990, for the reason that a later date would be in the best interest of Barber. *Id.* at 5–6, 8–11. Specifically, Schutzman argued a later date would enable Schutzman to fully discuss a plea offer by the Government with Barber and his family. *Id.* at 5–6, 8–9, 11. For instance, Schutzman stated:

[A]s we get more and more discovery and I'm in a better position to determine the probability of winning or losing at trial, I can then discuss it more with [Barber] and his family and then if the

---

**14.** At the New Trial Hearing, Barber initially conceded he had first met Schutzman at the Arraignment, but later changed his testimony to indicate the first meeting occurred on the date of his bail hearing (the "Bail Hearing"), 13 August 1990. New Trial Hrg. Tr. at 33, 51.

**15.** Schutzman mistakenly indicated the date of the Arraignment was 14 August 1990. Schutzman Aff., ¶ 4. It appears, moreover, that Altman rather than Schutzman entered an appearance on Barber's behalf at the arraignment. Docket Sheet at 2; Arraignment Min.

**16.** Barber testified that Schutzman never met with him in jail. New Trial Hrg.Tr. at 26. In fact, Barber asserted that, between 13 August 1990 and 2 October 1990, he never saw or spoke to Schutzman. Although Schutzman has acknowledged that (1) he never visited Barber in the Union County jail and (2) the only occasions on which he saw Barber were prior to court appearances, New Trial Hrg. tr. at 83–86, Schutzman does appear to have visited Barber's holding cell in the courthouse on a number of occasions and Barber's blanket denial of any pre-trial meetings is simply not supported by the record. *See infra* at pp. 374–75, 379–80.

decision may be made that it might be in his interest to try to plea bargain with the Government.

*Id.* at 5–6.

It appears that, at this time, no plea offer had yet been made. *Id.* at 6–9. Schutzman, therefore, requested a plea offer be made, stating "that's something I would be using in trying to determine the probability of the trial and what would be in [Barber's] best interest.... its hard to discuss with [Barber] what he should do [without a plea offer]." *Id.* at 10–11. Schutzman also stated: "I did discuss [with Barber] the possibility [of a plea bargain] because I told him that if the wiretap is held in, then he has to strongly consider the possibility of a plea." *Id.* at 11.

On 24 September 1990, Schutzman again met with Barber. Schutzman Aff., ¶ 5. According to Schutzman, he advised Barber that, although Schutzman was withdrawing the portions of the Suppression Motion relating to pre-arrest identification, he would still argue for the suppression of the wiretaps. *Id.* Schutzman gave Barber copies of the motion papers during this meeting. *Id.;* New Trial Hrg.Tr. at 67.

Later on Monday, 24 September 1990, Schutzman appeared in court at a combined hearing on the Suppression Motion and status conference (the "Suppression Hearing").[17] Transcript of Proceedings, dated 24 September 1990, at 2 (the "Suppression Hrg.Tr."). The Suppression Motion was denied. *Id.* at 2–7; Suppression Opinion at 1–17. Schutzman again requested a trial date later than 1 October 1990. Suppression Hrg.Tr. at 7. When Schutzman was asked why a later date was necessary, the following exchange occurred:

MR. SCHUTZMAN: Number One, now that the Court has denied the [Suppression M]otion[ ], I would like to speak to [Barber] about that, because there [sic] it had changed.

At first when I had done the motion and gave it to [Barber], I believe the Assistant U.S. Attorney heard the same thing, that [Barber] was complaining he would win the motion. Of course, there was nothing to discuss with him at that time.

Now that he has lost the motion, based on your Honor's ruling, it does change the facts. At this time, of course, I would discuss with the Assistant U.S. Attorney what he can do to help [Barber] if he should want to cooperate, and if our discussions, after I go visit him and his family fall apart, I believe the Assistant would need some time to get the case together.

THE COURT: I'm still inclined to try this next Monday [1 October 1990].

MS. PERCELL:[18] Your Honor, it seems to me that—I discussed this with Mr. Schutzman after our last appearance and he told me the same thing he's saying today. He said he couldn't talk to [Barber] about a plea because [Barber] wished he was going to win the motions. I heard the same thing coming out of the prison, he was sure he was going to get off.

We're really only starting to discuss a plea, but in order to do that, we need a proffer session and that will take a few days to set up. Its going to take a few days for [Schutzman] to discuss it with [Barber] and family, who is not located here.

. . . . .

THE COURT: ... We're going to trial Monday.

MR. SCHUTZMAN: ... [A] two week adjournment, which is short and I feel would give me enough time to discuss everything with [Barber], to further discuss it with [Barber's] family and Government and try to work things out,

---

**17.** Barber was not consistent regarding whether he was present when, prior to trial, Schutzman appeared in court on his behalf. At some points, Barber claimed he was not present in court. *See* New Trial Hrg.Tr. at 34. At other points, Barber conceded he was in court with Schutzman. Barber Aff., ¶ 5.

**18.** Marion Percell ("Percell") was the Assistant United States Attorney assigned to prosecute Barber's case.

which would be in the best interest of everybody. We could save everybody's time and energy and if not, at least I would know I made the best effort for [Barber]. I don't believe I can do a proper job for [Barber] in such a short time.

. . . . .

THE COURT: . . . I'm inclined to move the trial on Monday.

MR. SCHUTZMAN: Again, I just ask the court to reconsider only for the reason that I honestly I can't do what's best for my client in so short a time because everybody is in different states. It's not like I can even get everybody together in a day or two.

THE COURT: As far as a plea is concerned, you can speak with his family via telephone, but—

MR. SCHUTZMAN: Your Honor, I've found through experience with [Barber and his family], you really don't get anywhere on the phone with the[se] people. You have to sit down with them, you have to go over the reasoning.

. . . . .

THE COURT: You keep saying try to do the right thing.

MR. SCHUTZMAN: Let me explain. To do what's best for my client may not always be to go to trial. However, sometimes to explain it to a client is not as easy as it may seem where you and I will see something very clearly. They do not. Granted, the Courts don't sit for their benefit.

THE COURT: We do, on the contrary. He's indicted. He has a right to go to trial. That's why I'm here. It is for his benefit.

MR. SCHUTZMAN: It's not for [Barber's] benefit to be so rushed where I don't believe I would have the time to really explain everything.

THE COURT: I disagree with you. You're not being rushed. . . . You had this trial date sometime ago. You both knew about it. It's not like I gave you a week's notice.

MR. SCHUTZMAN: Except the decision was just made today and up until today, your Honor, of course I'm happy that [Barber] thought I was just a great attorney that he was so convinced he would win and walk away totally free, [Barber] was so convinced of this and I think from the information the Assistant U.S. Attorney heard it through scuttlebutt, there was no way.

If I tried to approach [Barber] before now, before your Honor made the decision, to tell him to discuss a plea, in all likelihood he would have been looking to get another attorney, figuring I didn't try properly a motion, that I wasn't doing a good job for him because he was so convinced of it.

THE COURT: Fine, you have a week to talk to him. . . . October 9 we pick a jury.

. . . . .

*Id.* at 7–14.

Schutzman has indicated that, following the Suppression Hearing, he discussed Barber's case with Crockett on a number of occasions.[19] Schutzman Aff., ¶ 6. In the week before trial, Schutzman also discussed the possibility of a plea bargain with Robert Mintz ("Mintz"), the Assistant United States Attorney assigned to try Barber's case in the absence of Percell.[20] *Id.*, ¶ 7; New Trial Hrg.Tr. at 69. Based on these discussions, Schutzman stated he communicated a plea offer to Barber and advised Barber to accept the Government's offer.[21] Schutzman Aff., ¶ 7; New Trial Hrg.Tr. at 68.

On 2 October 1990, Schutzman met with Barber at the United States Attorney's Office in Newark, New Jersey (the "Newark

---

**19.** Crockett denied ever speaking with Schutzman about Barber's case. New Trial Hrg.Tr. at 20.

**20.** Percell was apparently scheduled to try another case at this time and was replaced for trial purposes by Mintz. Status Conf.Tr. at 2.

**21.** The specifics of this plea offer have not been provided by the parties.

Meeting"). *Id.;* Dougherty Aff., ¶¶ 3–4. Barber was brought to the Newark Meeting by Detective John Dougherty ("Dougherty") of the Essex County Sheriff's Office, Bureau of Narcotics.[22] Dougherty Aff., ¶ 3. During the Newark Meeting, Barber and Schutzman[23] sat in a conference room and listened to all of the wiretap tapes the Government planned to introduce against Barber at trial.[24] Schutzman Aff., ¶ 7; Dougherty Aff., ¶ 4.

Barber has conceded he listened to the tapes and that all the tapes ultimately heard at trial he first heard at the Newark Meeting.[25] New Trial Hrg.Tr. at 27, 36. Barber has also conceded he understood that the purpose of the Newark Meeting was to discuss a plea bargain. *Id.* at 44.

After listening to the tapes, Schutzman met with Barber privately and, he has stated, "recommended once again that [Barber] accept the Government's plea offer."[26] Schutzman Aff., ¶ 7. Dougherty confirmed that Schutzman and Barber "had ample opportunity to confer" in private during the Newark Meeting and estimates the time at approximately one half hour.[27] Dougherty Aff., ¶ 6; New Trial Hrg.Tr. at 58, 70. According to Schutzman, Barber rejected the offer to plead guilty. Schutzman Aff., ¶ 7. Schutzman stated:

Barber responded that he would not plead guilty because there was no case against him. [Barber] informed me that the judge had made an error in not suppressing the wiretap tapes. [Barber] also insisted that he could not be found guilty because he was unable to obtain any drugs. Finally, [Barber] told me that his voice was not on the [G]overnment's tapes.

*Id.* At the Hearing for a New Trial, Schutzman further stated:

After the tapes, I believe I spent about a half hour with him [Barber] alone in the room. When I tried to discuss the possibility of a plea at that point, he got very angry and said to me whose side was I on, whether I was on the U.S. Attorney's side or him [sic]. He said that he spoke to everybody in the prison, they all told him the judge was wrong, everything should be suppressed.... He would not discuss a plea. He didn't want to hear about it.

New Trial Hrg.Tr. at 70.

Dougherty, Schutzman and even Barber confirmed that "Barber told [the Government] that it was not his voice on the tape." Dougherty Aff., ¶ 5; New Trial Hrg.Tr. at 39, 57. As a result of Barber's denial, Schutzman informed Mintz that Barber would not enter a guilty plea and

22. Dougherty, an officer with the Essex County Sheriff's Department, was at this time assigned to a United States Drug Enforcement Agency ("DEA") task force. New Trial Hrg.Tr. at 54. Dougherty was the case agent responsible for the prosecution of Barber. *Id.*

23. Schutzman arrived approximately twenty minutes late for the Newark Meeting. New Trial Hrg.Tr. at 55, 69. Barber had begun listening to the tapes on his own, prior to Schutzman's arrival. *Id.*

24. Barber testified that he did not know of the Newark Meeting in advance and that, upon arriving at the United States Attorney's Office, the first thing he did was to call Pugach. New Trial Hrg.Tr. at 26, 28–29. Barber further testified that Pugach told him to say nothing and insisted Barber not make a plea. *Id.* at 37.

Barber's testimony on this point is disputed. According to Schutzman, Barber not only knew about the Newark meeting but resisted listening to the tapes because he insisted he was "not guilty." *Id.* at 69. Moreover, Dougherty testi-

fied that Barber neither made a phone call upon arriving at the Newark Meeting nor did Barber ever ask for Pugach during the Newark Meeting. *Id.* at 58.

25. Barber listened to fifteen tapes at the Newark Meeting. New Trial Hrg. Tr. at 56. Of the fifteen tapes, eleven were played as evidence at trial. *Id.* Dougherty confirmed that all of the tapes played at trial were played to Barber at the Newark Meeting. *Id.*

26. Barber denied he and Schutzman ever discussed a guilty plea during the Newark Meeting and denied that any suggestion to plead guilty was made by Schutzman at this time. New Trial Hrg.Tr. at 37, 45.

27. Despite Schutzman's and Dougherty's corroboration as to the occurrence and length of Barber's private meeting with Schutzman, Barber insisted he never met privately with Schutzman during the Newark Meeting. New Trial Hrg.Tr. at 37–38, 47.

would go to trial. Dougherty Aff., ¶ 5; New Trial Tr. at 70.

On 9 October 1990, the date of the trial, Schutzman met Barber prior to trial in Barber's holding cell at the courthouse.[28] Schutzman Aff., ¶ 8; New Trial Hrg.Tr. at 71–72. Schutzman has stated he again advised Barber that "it was [his] legal judgment that he should enter a plea of guilty in this matter and accept the Government's plea offer." Schutzman Aff., ¶ 8; see also New Trial Hrg.Tr. at 72. Barber again refused to plead guilty. Schutzman Aff., ¶ 8; New Trial Hrg.Tr. at 72.

As a result of Barber's decision not to plead guilty, Schutzman asked Barber's family to speak to Barber about the possibility of a guilty plea. New Trial Hrg.Tr. at 72. Schutzman asked the court to delay the starting time of the trial so such a meeting could take place and a delay was granted. Id. at 72, 107. Barber conceded his mother visited his holding cell on the morning of the trial and discussed with him the possibility of pleading guilty. Id. at 40. Barber further conceded he told his mother he would not plead guilty. Id.

### B. Representation During and Following Trial

Throughout the trial, Schutzman represented Barber. Trial Tr. at 1–337. Barber has conceded this fact. New Trial Hrg.Tr. at 28. Barber has also conceded that not once during trial did he object on the record to Schutzman's representation or ask the court why he was being represented by Schutzman and not Pugach. Id. at 41–42. Schutzman, furthermore, testified at the Hearing for a New Trial that Barber never asked him for Pugach, during either the pre-trial or trial proceedings. New Trial Hrg.Tr. at 66, 76.

At trial, Schutzman made an opening statement on Barber's behalf. Trial Tr. at 20–23. During this statement, Schutzman argued that Barber was innocent and that

the Government would not be able to prove its case. Id. The Government then called three witnesses in support of its case against Barber: Nicholas Vinci ("Vinci"), Michael Kula ("Kula"); Michael Pasterchick, Jr. ("Pasterchick"). Id. at 23–234.

Vinci, a narcotics police officer with the Essex County Sheriff's department, testified as to drugs and other items found in the apartment of Gore, Barber's alleged co-conspirator. Id. at 23–43. During the direct examination of Vinci, Schutzman objected to the admission into evidence of narcotics, drug paraphernalia and address books[29] found in Gore's house. Id. at 28–38. Schutzman argued these proposed exhibits were not connected to Barber and their admission was unduly prejudicial. Id. At that time, the objection was sustained subject to certain stipulations. Id. at 30. Schutzman cross-examined Vinci. Id. at 43–44.

Kula, a special agent with the DEA in Baltimore, Maryland, then testified as to the events surrounding the arrest of Barber and as to conversations Kula had with Barber following the arrest. Id. at 44–55. Kula also identified Barber's voice on a number of the taped conversations that had been offered into evidence by the Government. Id. at 55–59. Schutzman cross-examined Kula extensively on these points. Id. at 59–76. Schutzman also interposed an objection during the re-direct examination of Kula and conducted a re-cross examination. Id. at 78–81.

Following Kula's testimony, the record contains a sidebar conference during which the evidence previously excluded—the narcotics, narcotics paraphernalia and address books bearing Barber's name, addresses and phone numbers—was again considered for admission. Id. at 81–90. Schutzman argued at length for the continued exclusion of these items from evidence. Id. While Schutzman consented to the admis-

---

**28.** Barber testified that he could not recall Schutzman visiting his holding cell on the morning of the trial. New Trial Hrg.Tr. at 40. Yet, Barber could recall his mother visited his holding cell on the morning of the trial. Id. at 40.

**29.** It was stipulated that Barber's name, addresses and phone numbers were in the address books found in Gore's apartment. Trial Tr. at 41–42.

sion of the address books, he continued to stress that the drugs and drug paraphernalia were "unduly prejudicial." *Id.* at 83–90. Again, Schutzman was successful in keeping the drugs and much of the drug paraphernalia from being introduced as evidence.[30] *Id.* at 86–90.

The Government's next witness was Pasterchick, an agent with the DEA in Newark, New Jersey. *Id.* at 95. It was stipulated Pasterchick was an expert in narcotics distribution, paraphernalia and drug language. *Id.* at 105. Thereafter, the Government played the taped telephone conversations between Barber, Gore and others which the Government had gathered from its wiretap of Gore. *Id.* at 106–213. After each tape was played, Pasterchick testified as to the meaning of the coded conversations between Barber and Gore. *Id.* at 109–221. Pasterchick also demonstrated how the narcotics paraphernalia seized from Gore are used by drug dealers to dilute and divide their drugs. *Id.* at 221–34.

Throughout Pasterchick's testimony, Schutzman made objections which, on a number of occasions, were sustained. *See id.* at 113–16, 125. Because of an objection by Schutzman, Schutzman was allowed to cross-examine Pasterchick as to each individual tape, prior to the playing of the next tape by the Government. *Id.* at 125–135. Schutzman cross-examined Pasterchick as to each tape and as to Pasterchick's demonstration of the drug paraphernalia. *Id.* at 125–35, 137–39, 142–147, 150–51, 154–56, 161–66, 172–79, 182–88, 190–205, 207–213, 219–221, 228–34.

Among other things, Schutzman's cross-examination of Pasterchick established that Pasterchick (1) was not involved in the in-

vestigation of Barber and Gore, (2) had no personal knowledge of the voices on the tape,[31] (3) could not say from the tapes if the alleged deals between Gore and Barber were ever consummated and (4) could not link Barber to the drugs and drug paraphernalia seized from Gore. *Id.* at 125, 134–35, 162, 165–66, 210–11, 221, 229–31. Schutzman was also successful in getting a number of his questions answered over both objections from the Government and the reticence of Pasterchick. *Id.* at 127, 129–30, 155, 165–66, 212.

Schutzman called three witnesses on behalf of Barber: Alvin Johnson ("Johnson"), Cynthia Barber ("C. Barber") and Gore. *Id.* at 235–46. Johnson, an in-law and co-worker of Barber, testified as to the origin and phone number of the cellular phone from which Barber was alleged to have conversed with Gore. *Id.* at 235–36. This testimony was intended to establish a legitimate purpose for Barber having a cellular phone.[32] *Id.* at 280–81. C. Barber, the mother of Barber, testified as to events which occurred on the day of the arrest of Barber, specifically with regard to the efforts made by Kula and DEA agents to locate Barber at her home and with regard to cooperation from Barber with the DEA agents once he learned he was sought for arrest. *Id.* at 236–39, 276–78.

Concerning Gore, the Trial Transcript reveals the following exchange:

COURT: ... Mr. Schutzman, there is something you want on the record?

MR. SCHUTZMAN: Yes. I'm sure the Court remembers yesterday, I stated to the Court when we first discussed the possibility of calling [Gore], that I didn't really want to call him but my client insisted I call him.[33]

---

**30.** Schutzman stipulated the Government could use the paraphernalia for demonstration purposes—*i.e.* by an expert to explain how the paraphernalia is used in relation to the narcotics—but much of the paraphernalia was excluded as direct physical evidence. *Id.* at 86–90.

**31.** Barber's voice on the tapes had already been identified by Kula. *See supra* at p. 370.

**32.** Cellular phones are apparently a commonly-used device in drug dealing. Trial Tr. at 280–81.

**33.** At the Hearing for a New Trial, Schutzman reiterated his advice to Barber not to call Gore. New Trial Hrg.Tr. at 74, 92. The New Trial Hearing transcript states:

Q [by Mintz]. Did you give advice to Mr. Barber as to whether or not it was in his best interest to have Mr. Gore testify at his trial? A [by Schutzman]. I felt it was not. I did not want to call Mr. Gore. I only agreed to call him because Mr. Barber insisted and I believe that if a client insists that you do something, its my job to advise him. If I do

I'm going to ask the Court now we know he's ready to testify for me, to have time to explain to my client what the court just stated on the record, that if [Gore] does take the stand under oath now, agrees to testify but then in the presence of the jury suddenly invokes the Fifth Amendment, there is a very high probability that the Court will have to declare a mistrial.

*Id.* at 242–43. Upon being placed under oath, but out of the presence of the jury, Gore refused to testify and invoked his Fifth Amendment right against self-incrimination.[34] *Id.* at 243–46.

Barber himself did not testify during his trial.[35] The Trial Transcript suggests that the decision not to testify was made by Barber:

> COURT: Next witness?
>
> MR. SCHUTZMAN: I was going to ask to recess. [Barber] has requested to consider also further whether or not he should take the stand. It is a big step for a defendant.
>
> [Recess granted] [36]

*Id.* at 246–47; *see also id.* at 250 (defense rested without Barber testifying). Barber later affirmed his decision not to testify when he personally requested the court to instruct the jury on the right of a criminal defendant not to testify.[37] *Id.* at 252.

After the presentation of evidence, Schutzman continued to participate in the trial. Schutzman submitted proposed jury instructions, most of which were incorporated into the court's jury charges. *Id.* at 90, 250–51. For example, Schutzman requested the court to charge the jury as to Barber's decision not to testify and the jury was instructed accordingly. *Id.* at 251–52, 299. Upon a reading of the proposed jury charge to Barber, Barber affirmed his decision not to testify and requested the court to proceed with instructing the jury as to the right of a criminal defendant not to testify. *Id.* at 252. Schutzman also briefed the issue of whether the conspiracy with which Barber was charged required an overt act. *Id.* at 90.

Schutzman made a closing argument on behalf of Barber. *Id.* at 274–86. In closing, Schutzman explained the motives for calling the witnesses who were called, emphasized that none of the witnesses called by the Government personally knew Barber and argued that no agreement to purchase narcotics was ever reached between Barber and his alleged suppliers in Pakistan. *Id.* Finally, immediately following the guilty verdict, Schutzman moved and argued that the verdict should be dismissed pursuant Fed.R.Crim P. 29.[38] *Id.* at 330–

---

the wrong thing for him, I do the wrong thing.
*Id.*

**34.** According to Barber, he and Schutzman never discussed the subject of witnesses until the first day of trial, at the counsel table upon the trial's commencement. New Trial Hrg.Tr. at 42. Schutzman has disputed this point. According to Schutzman, he and Barber discussed possible defenses and witnesses at the Newark Meeting, once it became clear Barber would not plea. *Id.* at 70–71, 92–93.

**35.** According to Barber, Schutzman never discussed with him whether he should testify on his own behalf. New Trial Hrg.Tr. at 47–48, 53. Schutzman has indicated that this subject was discussed on the morning of the first day of trial, during Schutzman's visit to Barber's holding cell. *Id.* at 72. Schutzman also explained the topic was discussed with Barber in his holding cell, following the second day of trial, after Schutzman had requested an adjournment for the express purpose of speaking with Barber about whether he should testify. *Id.* at 75.

**36.** Barber asserted that, despite this recess, Schutzman never discussed with him whether Barber should testify. New Trial Hrg.Tr. at 48–50. Schutzman disputed this point. *See supra* note 24.

**37.** Schutzman indicated that, upon discussing the case that the Government had presented, he advised Barber not to testify. New Trial Hrg.Tr. at 73. Schutzman states:

> I recommended that he didn't take the stand because all [the Government's] witnesses admitted that [Barber] was never able to obtain any narcotics, that the tapes all showed that when he was offered narcotics, he would never buy any from the person. I felt he couldn't add anything to that and that if he took the stand and anything was brought out about his background, it would hurt him.

*Id.* at 73.

**38.** Schutzman had previously apprised the court of his intent to make this motion and had supplied the court with a supporting memorandum of law. Trial Tr. at 331.

35. The motion was denied.[39] *Id.*

At sentencing, Schutzman again represented Barber. Sentencing Tr. at 1–2. Schutzman argued the sentencing guidelines adopted by the presentence report were improper, *id.* at 2–4, and that, even if adopted, Barber should receive a reduction for "accepting responsibility" by not taking the stand or denying the phone conversations. *Id.* at 4–6. Schutzman then moved unsuccessfully to set aside the verdict on the ground that the evidence was insufficient as a matter of law. *Id.* at 6–8. Finally, Schutzman argued Barber should be given a minimum sentence because he never actually possessed narcotics. *Id.* at 9–11.

During sentencing, Barber was given an opportunity to speak. *Id.* at 11. The Sentencing Transcript reveals the following:

COURT: Mr. Barber, this is your opportunity to speak with me. Is there *anything* you would like to say?

[BARBER]: Just that I can't justify my actions but I never did have any drugs to sell or know about drugs. I did a lot of talking on the phone, that's true and *I tried to get drugs from a guy in Pakistan and that's true,* but other than that, your Honor, I never did do anything.

*Id.* at 11–12 (emphasis added). Barber made no other comment on the record. Significantly, Barber did not object at the Sentencing Hearing to either Schutzman's continued representation or to the absence of Pugach throughout the trial. New Trial Hrg.Tr. at 122. As indicated previously, Barber was sentenced to one hundred sixty-five months incarceration to be followed by a five year supervised release. *Id.* at 13–14; Judgment at 2–3.

On behalf of Barber, Schutzman filed the Appeal with the Circuit. Notice of Appeal, filed 8 January 1991. According to Barber himself, Schutzman represented Barber

during the Appeal. Moving Brief, ¶ 7; *see also* New Trial Hrg. Tr. at 75. As before, the Appellate Brief was prepared by Pugach and reviewed by Schutzman. New Trial Hrg.Tr. at 89. The conviction and sentence were affirmed.

*Discussion*

A. The Right To Counsel

Barber's initial argument is that, throughout the pre-trial and trial stage, he believed that his real attorney was Pugach and not Schutzman. Moving Brief at 1–2; Barber Aff., ¶¶ 2–5; New Trial Hrg.Tr. at 24–32, 37, 41, 44. Because Pugach was and is not an attorney, Barber has contended "for all practical purposes, [Barber] had no counsel whatsoever." Moving Brief at 2. Barber has also contended he never met with Schutzman prior to trial and he did not realize Schutzman would be representing him until the eve of trial. Barber Aff., ¶¶ 5–6; New Trial Hrg. Tr. at 25, 29–31, 44. Barber has argued, therefore, that "no meaningful attorney-client relationship had ever formed between Barber and Schutzman. The only relationship formed by Barber was with Pugach, and he was not a licensed attorney." Moving Brief at 5.

The Sixth Amendment provides in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defense." U.S. Const. amend VI. Although courts have held a defendant's conviction must be reversed when a defendant is represented by someone who fraudulently claims to be a licensed attorney, *see, e.g., United States v. Novak,* 903 F.2d 883 (2d Cir.1990); *Solina v. United States,* 709 F.2d 160 (2d Cir.1983), the Supreme Court has indicated the focus of the Sixth Amendment is on the "adversarial process, not on the accused's relationship with his lawyer as such." *United States v. Cronic,* 466 U.S. 648, 657 n. 21, 104 S.Ct. 2039, 2046 n.

---

**39.** Schutzman testified at the Hearing for a New Trial that, right after the jury returned its verdict, Barber complimented Schutzman on his efforts. Schutzman stated:

[Barber] told me, "Don't feel so bad about it." He thought I did the best job I could do. His parents said the same thing and asked me if I

could do the appeal, and I think I mentioned it to [Mintz] because I was surprised, because it's very rare that you lose a case and you're asked right then and there to do the appeal. New Trial Hrg.Tr. at 75. Barber denied ever making any such statement. *Id.* at 50.

21, 80 L.Ed.2d 657 (1984); *accord Wheat v. United States*, 486 U.S. 153, 158, 108 S.Ct. 1692, 1696, 100 L.Ed.2d 140, *reh'g denied*, 487 U.S. 1243, 108 S.Ct. 2918, 101 L.Ed.2d 949 (1988).

In this case, Barber's claim that he was not represented by counsel is meritless. Despite a letter from Altman to the court that Pugach was being sent Altman's files on the Barber matter, *see supra* at pp. 363–64, and despite Barber's contention that Pugach filed a notice of appearance on Barber's behalf, Barber Aff., ¶ 3, neither the Docket Sheet nor any other document in this case contains a notice of appearance by Pugach. No mention of an appearance by Pugach is recorded in the Arraignment Minutes, the Status Conf.Tr., the Suppression Hearing Transcript, the Trial Transcript or the Sentencing Transcript. Pugach's name, moreover, is not once mentioned in any of these proceedings nor does it ever appear on the papers filed on behalf of Barber in this court, either before or during trial. In fact, to this date, Barber has conceded he has *never met* Pugach. New Trial Hrg.Tr. at 32–33.

In contrast, the record reveals extensive activity by Schutzman prior to the trial. On 13 August 1990, Schutzman appeared on Barber's behalf at the Bail Hearing before Judge Haneke. Bail Hrg. Min.; Docket Sheet at 2. On the same day,

Schutzman served on the Government detailed discovery requests and bill of particulars. Opp. Brief, Ex. C. Schutzman also appears to have been present at Barber's arraignment on 8 August 1990, although Altman made the official appearance on Barber's behalf. Schutzman Aff., ¶ 4,; *see supra* note 15.

On 31 August 1990, Schutzman filed the Suppression Motion with an accompanying fourteen page affirmation.[40] Docket Sheet at 2; Schutzman Affirm.; Suppression Opinion at 1 n. 1. On 14 September 1990, Schutzman appeared at the Status Conference and argued for an extension of the trial date. Status Conf.Tr. at 1–11. On 24 September 1990, Schutzman appeared at the Suppression Hearing, again arguing on behalf of Barber with respect to the Suppression Motion and for a later trial date. Suppression Hrg.Tr. at 2–14. Finally, on 2 October 1990, Schutzman appeared with Barber at the Newark Meeting to listen to the wiretaps which the Government intended to use against Barber at trial. Schutzman Aff., ¶ 7; Dougherty Aff., ¶¶ 3–4.

In addition to this pre-trial activity on Barber's behalf, Schutzman stated he met Barber on a number of occasions prior to trial to discuss Barber's case,[41] particularly with respect to the possibility of Barber pleading guilty.[42] At a minimum, these

---

**40.** Barber has taken issue with the fact that Pugach actually prepared Barber's written submissions, subject to the review and approval of Schutzman. New Trial Hrg.Tr. at 80–83, 89. Because Schutzman testified at the Hearing for a New Trial that he could not remember any specific alterations made by him in reviewing Pugach's work, *id.*, Barber would imply that no corrections were, in fact, made by Schutzman. This implication is unpersuasive. To expect that Schutzman would remember the precise alterations made in a document prepared over two years ago is unreasonable. Schutzman's failure to recall such changes proves nothing and makes it neither more nor less likely that either Schutzman or Pugach represented Barber.

**41.** Schutzman also stated he was telephoned by Crockett on numerous occasions during this time; on those occasions, he discussed Barber's case with Crockett. Schutzman Aff., ¶ 6.

**42.** Barber has attempted to attach significance to the fact that Schutzman did not discuss the

possibility of a guilty plea with Barber "as late as 24th September [1990]." New Trial Hrg.Tr. at 84. This argument is frivolous. As the Suppression Hearing Transcript indicates, the Government had only started discussing a guilty plea on 24 September 1990. Suppression Hrg. Tr. at 7–14. In fact, it was Schutzman who, on 14 September 1990, requested the Government to make a plea offer. Status Conf.Tr. at 10–11. Barber has not explained how Schutzman was supposed to discuss a plea offer when no plea offer had been made by the Government.

Moreover, the record indicates Schutzman attempted to discuss a plea with Barber on numerous occasions but Barber refused to discuss the issue. *See, e.g.,* Suppression Hrg.Tr. at 7–14; Schutzman Aff., ¶ 7. Percell confirmed that Barber was convinced he would win the Suppression Hearing Motion, Suppression Hrg.Tr. at 7–14, while Dougherty and Barber himself confirmed Barber told the Government at the Newark Meeting that it was not his voice on the wiretap tapes. Dougherty Aff., ¶ 5; New Trial Hrg.Tr. at 39, 57. Even at Barber's sentencing,

occasions include: during Barber's arraignment on 8 August 1990, at the Bail Hearing, prior to the Suppression Hearing on 24 September 1990, at the Newark Meeting on 2 October 1990 and just prior to trial on 9 October 1990. Schutzman Aff., ¶¶ 4–5, 7–8. Three of these meetings are confirmed by persons other than Schutzman. *See* Suppression Hrg.Tr. at 7–14 (recognition by Percell that Schutzman had consulted with Barber prior to Suppression Hearing); Dougherty Aff., ¶¶ 3–4 (discussing Newark Meeting); New Trial Hrg.Tr. at 33–34 (recognition by Barber that he discussed bail with Schutzman at either the Bail Hearing or the Arraignment).

It is not contested that Schutzman represented Barber during trial. Barber Aff., ¶ 5.; Moving Brief at 5; Trial Tr. 1–337. In the course of this representation, Schutzman gave opening and closing statements, cross-examined the Government witnesses at length, elicited testimony from the Government witnesses favorable to Barber, called witnesses for the defense, successfully interposed and defended against objections to testimony, successfully argued that physical evidence in the form of narcotics and narcotics paraphernalia should not come into evidence, submitted jury instructions which were substantially adopted and moved to have the verdict dismissed pursuant to Fed.R.Crim.P. 29. *See supra* at pp. 370–73.

Barber has conceded Schutzman is a qualified and licensed attorney at law. Moving Brief at 5. Although this conces-sion alone disposes of Barber's argument that he was not represented by counsel,[43] Barber's contention is all the more meritless in light of the documented and extensive representation by Schutzman, both prior to and during trial.[44] When contrasted with the almost total lack of recorded references to Pugach, and the fact that Barber—to this day—has never met Pugach, the statement by Barber that he believed he was being represented by Pugach until the eve of trial is not credible.[45]

Barber's assertion regarding Pugach appears even more incredible by virtue of Barber's admitted failure to object even once to the representation by Schutzman and not Pugach. New Trial Hrg.Tr. at 122. The record indicates Barber was given a number of opportunities to speak. For instance, prior to jury instructions regarding his decision not to testify, Barber was asked whether he wanted such an instruction. Trial Tr. at 252. At this point, rather than objecting to representation by Schutzman or to the alleged failure of Schutzman to discuss with him whether he should testify, Barber simply confirmed that he wanted the proposed jury instruction. *Id.* As well, at the Sentencing Hearing, Barber was specifically asked: "Mr. Barber, this is your opportunity to speak with [the court]. Is there *anything* you would like to say?" Sentencing Tr. at 11–12 (emphasis added). Despite this opportunity, Barber again failed to object to his representation. *See id.*

Barber continued to maintain his innocence. Sentencing Tr. at 11–12. This persistent denial of guilt, as well as Barber's overconfidence with regard to the Suppression Motion, lend support to the statements of Schutzman that Barber would not discuss a guilty plea.

**43.** Barber's reliance on *Novak,* 903 F.2d 883, and *Solina,* 709 F.2d 160, is misplaced. In these cases, the defendants were actually represented at trial by unlicensed attorneys. *Novak,* 903 F.2d at 886–90; *Solina,* 709 F.2d at 164–69. Such is not the case here.

**44.** Crockett insisted Pugach, and not Schutzman, was Barber's attorney. *Id.* at 18. Crockett, however, has no first-hand knowledge on this point. Crockett did not attend Barber's Arraignment, trial or any of the proceedings, arguments or motion hearings prior to or after trial. New Trial Hrg.Tr. at 16. Crockett also testified that she is aware Pugach never appeared in court with Barber. *Id.* at 17–18. At the New Trial Hearing, Crockett actually stated: "I don't know who represented [Barber] in court." *Id.* at 20. Crockett is simply in no position to speak as to who represented Barber.

**45.** This does not even consider the statements from Schutzman that, upon his first meeting with Crockett, Crockett was (1) informed that Pugach was a paralegal and Schutzman was an attorney and (2) given Pugach's card indicating Pugach was a paralegal. Schutzman Aff., ¶ 3. Nor does it consider the statement by Schutzman that Barber's retainer was paid by Crockett to Schutzman directly. *Id.*

It is difficult to accept that Barber—a recently convicted man facing significant jail time, having been represented throughout the process by someone whom he allegedly believed was not his attorney and with whom he allegedly had no significant discussions concerning, *inter alia,* what defense to present, what witnesses to call, whether he should testify on his own behalf and whether he should accept a guilty plea—would not, at some point, object to his representation. Yet, as conceded by Barber's attorney at the Hearing for a New Trial, no objection was ever voiced by Barber until now. New Trial Hrg.Tr. at 122. Barber even failed to object on appeal when, once again, it was Schutzman and not Pugach who represented Barber on appeal before the Circuit. *Id.* at 75, 122; Notice of Appeal, filed 8 January 1991.

Finally, in light of the extensive record in this case, it is also difficult to accept the assertions by Barber that: (1) "no meaningful attorney-client relationship" had developed between Schutzman and Barber prior to trial, Moving Brief at 5; (2) "Schutzman never visited [Barber] once in jail before trial," Barber Aff., ¶ 5; and (3) Schutzman had "never spoken to [Barber] prior to the start of trial, and therefore, had no idea what, if any, defense to present." Moving Brief at 3; Barber Aff., ¶ 6. The meetings between Schutzman and Barber prior to trial, *see supra* at pp. 374–75, as well as the strategies pursued by Schutzman during both the trial and pretrial phases, *see supra* at pp. 370–73, 373–74, contradict these assertions.

It is apparent from the record Schutzman was concerned with protecting Barber's rights and with ensuring Barber was informed as to what was occurring in the case. During both the Status Conference and the Suppression Hearing, Schutzman argued vigorously and successfully for a later trial date to allow him to discuss the possibility of plea with Barber and his family in a proper and meaningful manner. Status Conf.Tr. at 5–6; Suppression Hrg.

Tr. at 7–14. Schutzman arranged for the Newark Meeting so that Barber could hear the evidence against him and make an informed judgment as to whether or not to accept a plea. New Trial Hrg.Tr. at 69. On the morning of the first day of trial, Schutzman requested and received a delay so that Barber's family could speak to Barber a final time about pleading guilty. *Id.* at 72, 107. Finally, at the close of the second day of trial, Schutzman requested and was given a recess to discuss with Barber whether he should testify on his own behalf.[46] Trial Tr. at 246–47.

## B. Ineffective Assistance of Counsel

In the alternative, Barber has argued he was denied the effective assistance of counsel by Schutzman's representation. Moving Brief at 6–9. Specifically, Barber has contended that Schutzman did not meet with Barber prior to trial and therefore failed to discuss with Barber (1) whether Barber should accept a plea, (2) whether and what kind of defense to pursue and (3) whether Barber should testify. Moving Brief at 7–9. The Moving Brief states:

> Having never seen [Barber] before the start of the trial, it was impossible for Schutzman to have ever discussed with [Barber] the possibility of a plea. Similarly, the absence of any contact between attorney and client negated any meaningful opportunity for the two to discuss what defense to interpose, and whether or not [Barber] should exercise his right to testify.

*Id.* at 8. Barber's argument is that, under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, *reh'g denied,* 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864 (1984), Schutzman's actions were inadequate and prejudicial to Barber. *Id.* at 8.

### 1. *Standard of Review*

■ A defendant has a Sixth Amendment right not just to counsel, but to "rea-

---

**46.** Schutzman's decision to call Gore as a defense witness at trial also supports the proposition that Schutzman was sensitive to Barber's concerns; this decision was based upon Bar-

ber's insistence, contrary to Schutzman's judgment, that Gore be called as a witness. Trial Tr. at 242–43; New Trial Hrg.Tr. at 71.

sonably effective counsel." *United States v. Day*, 969 F.2d 39, 42 (3d Cir.1992) (quoting *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064); *Wells v. Petsock*, 941 F.2d 253, 259 (3d Cir.1991), *cert. denied sub nom., Wells v. Vaughn*, ‒‒ U.S. ‒‒, 112 S.Ct. 3038, 120 L.Ed.2d 906 (1992).

▋ The Supreme Court has set forth the test for ineffective assistance of counsel claims as follows:

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064; *see also Wells*, 941 F.2d at 259. A litigant claiming ineffective assistance of counsel "must prove both incompetence and prejudice." *Kimmelman v. Morrison*, 477 U.S. 365, 381, 106 S.Ct. 2574, 2586, 91 L.Ed.2d 305 (1986) (citing *Strickland*, 466 U.S. at 688, 104 S.Ct. at 2065); *accord Day*, 969 F.2d at 42.

With respect to the first prong of the *Strickland* test, the Supreme Court explained that the defendant "must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688, 104 S.Ct. at 2064; *Hull v. Freeman*, 932 F.2d 159, 167 (3d Cir.1991). The Supreme Court has further stated:

"A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment.... The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the

wide range of professionally competent assistance."

*Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066; *see also Zettlemoyer v. Fulcomer*, 923 F.2d 284, 296 (3d Cir.1991) (defense counsel cannot be deemed ineffective just because counsel is not successful), *cert. denied*, ‒‒ U.S. ‒‒, 112 S.Ct. 280, 116 L.Ed.2d 232 *reh'g denied*, ‒‒ U.S. ‒‒, 112 S.Ct. 624, 116 L.Ed.2d 646 (1991).

▋ In *Day*, the Circuit elaborated on the second prong of an ineffective assistance claim requiring a showing of prejudice: "*Strickland v. Washington* does not require certainty or even a preponderance of the evidence that the outcome would have been different with effective assistance of counsel; it requires only a reasonable probability that that is the case." 969 F.2d at 45 n. 8; *see also United States v. Baynes*, 687 F.2d 659, 670 (3d Cir.1982) (cited with approval in *McNeil v. Cuyler*, 782 F.2d 443, 447 (3d Cir.), *cert. denied*, 479 U.S. 1010, 107 S.Ct. 654, 93 L.Ed.2d 709 (1986)). Nevertheless, the petitioner must demonstrate that, but for unprofessional errors by counsel, the result of the proceeding would have been different. *Kimmelman*, 477 U.S. at 381, 106 S.Ct. at 2586; *Hull*, 932 F.2d at 167.

▋ "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065; *Moore v. Deputy Commissioners*, 946 F.2d 236, 246 (3d Cir.1991), *cert. denied*, ‒‒ U.S. ‒‒, 112 S.Ct. 1509, 117 L.Ed.2d 647 (1992). In assessing an attorney's performance, courts must be "highly deferential" and "must indulge a strong presumption that counsel's challenged conduct falls within the wide range of reasonable professional assistance." *Id.; see also Reese v. Fulcomer*, 946 F.2d 247, 257 (3d Cir.1991), *cert. denied*, ‒‒ U.S. ‒‒, 112 S.Ct. 1679, 118 L.Ed.2d 396 (1992); *Moore*, 946 F.2d at 246; *Hull*, 932 F.2d at 167; *United States v. Gray*, 878 F.2d 702, 710 (3d Cir.1989).

■ In making a determination of ineffective assistance, a court must consider the "totality of evidence." *Hull*, 932 F.2d at 167–68 (citing *Strickland*, 466 U.S. at 695–66, 104 S.Ct. at 2069); *see also Reese*, 946 F.2d at 256 (court must consider "all facts of the case" in reviewing claim for ineffective assistance).

### 2. *Plea Bargains*

■ The plea bargain stage is a critical stage with regard to the right to effective assistance of counsel. *United States ex rel. Caruso v. Zelinsky*, 689 F.2d 435, 438 (3d Cir.1982) (citing *Gallarelli v. United States*, 441 F.2d 1402, 1405 (3d Cir. 1971)). The same two-part *Strickland* test also applies to ineffective assistance claims arising out of the plea process. *Hill v. Lockhart*, 474 U.S. 52, 57, 106 S.Ct. 366, 369, 88 L.Ed.2d 203 (1985); *Day*, 969 F.2d at 42–45; *Dooley v. Petsock*, 816 F.2d 885, 889 (3d Cir.), *cert. denied*, 484 U.S. 863, 108 S.Ct. 182, 98 L.Ed.2d 135 (1987).

■ The Circuit has stated that the first prong of the *Strickland* test is satisfied in two circumstances. *Day*, 969 F.2d at 42–44. First, an attorney's conduct is incompetent when the plea offer is never communicated by the attorney to the client. *Id.* Incompetence is also found when the plea information is communicated but is so incorrect and insufficient that it undermines the ability of the client to make an intelligent decision whether or not to accept the offer. *Id.* at 43. The Circuit has also stated that, because failing to advise a client as to the nature of a plea bargain deprives the client of the opportunity to accept a plea bargain in exchange for a lesser sentence, a fair trial does not remedy an attorney's incompetence. *Id.* at 44–45.

Applying the *Strickland* test to plea bargains, the Supreme Court stated:

In the context of guilty pleas, the first half of the *Strickland v. Washington* test is nothing more than a restatement of the standard of attorney competence already set forth in *Tollett v. Henderson* [411 U.S. 258, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973)] and *McMann v. Richardson* [397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970)]. The second, or "prejudice," requirement, on the other hand, focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process. In other words, in order to satisfy the "prejudice" requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.

*Hill*, 474 U.S. at 58–59, 106 S.Ct. at 370. Where a plea has not been accepted, with regard to the second prong of *Strickland*, the Circuit has stated: "[P]rejudice in fact ... requires consideration of whether [the defendant] would have accepted the alleged plea offer and whether the District Court would have approved it." [47] *Day*, 969 F.2d at 45.

■ The claim by Barber that Schutzman rendered ineffective assistance by failing to discuss the possibility of a plea bargain with Barber does not satisfy either prong of the *Strickland* test. The record indicates that Schutzman was extremely concerned that he have a meaningful opportunity to discuss the possibility of a plea bargain with Barber and his family. Status Conf.Tr. at 5–6; Suppression Hrg.Tr. at 7–14; New Trial Hrg.Tr. at 68–70, 72. With this in mind, Schutzman argued vigorously, and successfully, that the trial date be pushed back from 1 October 1990. Suppression Hrg.Tr. at 7–14. Schutzman also requested that the Government make Barber a plea offer so that Schutzman could discuss with Barber what course was in Barber's best interest. Status Conf.Tr. at 6–11. Finally, Schutzman was even successful in delaying the start of the trial on 9 October 1990, so that Barber's mother

**47.** Because of the fear that the self-serving, post-conviction testimony of a defendant regarding his wish to accept a plea offer might lack sincerity, numerous circuits have demanded "some 'objective evidence' that a defendant would have accepted a plea offer." *Day*, 969 F.2d at 45; *see,* *e.g., Toro v. Fairman*, 940 F.2d 1065, 1068 (7th Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 3038, 120 L.Ed.2d 907 (1992); *Diaz v. United States,* 930 F.2d 832, 835 (11th Cir.1991). The Third Circuit has not imposed such a requirement. *Day,* 969 F.2d at 45–46.

could visit Barber and speak to him one final time about accepting a guilty plea. New Trial Hrg.Tr. at 72, 107.

As previously indicated, no plea discussions between the Government and Schutzman appear to have occurred until the week before trial. Schutzman Aff., ¶ 7; Suppression Hrg.Tr. at 7–14. On 2 October 1990, Schutzman and Barber attended the Newark Meeting to listen to the wiretaps and to consider the possibility of a guilty plea. Schutzman Aff., ¶ 7; Dougherty Aff., ¶¶ 3–4. During the Newark Meeting, Barber and Schutzman sat in a conference room, listened to the tapes and engaged in private discussions. Schutzman Aff., ¶ 7; Dougherty Aff., ¶¶ 4, 6. Upon conclusion of the Newark Meeting, Barber informed Schutzman and the Government that it was not his voice on the tapes, meaning that no guilty plea would be forthcoming. Schutzman Aff., ¶ 7; Dougherty Aff., ¶ 5.

In addition to this confirmed meeting between Schutzman and Barber, Schutzman indicated that, on numerous occasions, he actually advised Barber that a guilty plea was in Barber's best interests. Schutzman Aff., ¶¶ 7–8; Status Conf.Tr. at 11; Suppression Hrg.Tr. at 7–14; New Trial Hrg. Tr. at 68, 70–72. This advice was apparently rendered both prior to and following the denial of the Motion to Suppress, following Barber's listening to the wiretaps at the Newark Meeting and on the morning of the trial. Schutzman Aff., ¶¶ 7–8; Status Conf.Tr. at 11; Suppression Hrg.Tr. at 7–14; New Trial Hrg.Tr. at 68, 70–72.

Barber has offered no reason to doubt that these additional conversations took place. Barber has made blanket assertions that no pre-trial plea discussions took place and that Schutzman had "never seen" Barber prior to trial. These assertions are contradicted both by the record and by Barber himself. Percell and Dougherty confirm that at least two pre-trial meetings took place between Barber and Schutzman. Suppression Hrg.Tr. at 7–14; Dougherty

Aff., ¶¶ 3–6. Barber himself confirmed he met with Schutzman at either the Arraignment or the Bail Hearing and the two spoke about Barber's bail situation. New Trial Hrg.Tr. at 33–34.

Even further, the Newark Meeting and events which occurred there had no logical purpose other than to allow Barber to hear the evidence against him and to consider entering a guilty plea. Barber, in fact, conceded in his testimony at the Hearing for a New Trial that the purpose of the Newark Meeting was to reach an arrangement with the Government whereby Barber would reveal the identity of his Pakistani connection and the Government would "make things better for [him]." *Id.* at 44. In light of these facts, the assertions that Schutzman never discussed the possibility of a guilty plea with Barber are not credible and Barber has not established that Schutzman's behavior with regard to the plea process was inadequate.

 Barber has also failed to establish he has been prejudiced by Schutzman's behavior. Schutzman argues, and the record confirms, that throughout this entire course of events, Barber has maintained his innocence and refused to consider entering a guilty plea. Schutzman Aff., ¶¶ 7–8. As confirmed by Percell, this was true prior to the Suppression Hearing. Suppression Hrg.Tr. at 7–14. As confirmed by Dougherty, this was true even after hearing the recorded evidence against him. Dougherty Aff., ¶ 5; New Trial Hrg.Tr. at 57. As confirmed by Barber himself, this was true on the morning of the first day of trial. *Id.* at 40. And, as demonstrated by the Sentencing Tr., this was true even after Barber had been convicted.[48] Sentencing Tr. at 11–12.

Barber has not demonstrated that, but for Schutzman's conduct, Barber would have pleaded guilty. *Hill,* 474 U.S. at 58–59, 106 S.Ct. at 370; *Day,* 969 F.2d at 45. In fact, not once during the Hearing for a New Trial did Barber or his attorney argue that Barber would have pleaded guilty but

---

**48.** Although Barber continued to profess his innocence at the Sentencing Hearing, he acknowledged engaging in conduct sufficient to estab-

lish his guilt. Sentencing Tr. at 11–12; *see infra* at p. 381.

for Schutzman's conduct. On this point, therefore, Barber has failed to demonstrate the prejudice necessary to succeed on his claim for ineffective assistance.

3. *Other Contentions Regarding Ineffective Assistance*

■ As indicated above, Barber has contended Schutzman failed to adequately prepare for trial by not meeting with Barber prior to trial. Moving Brief at 8. Not only has it been established that Schutzman did meet with Barber on numerous occasions prior to trial, but the actions of Schutzman as reflected in the record indicate extensive pre-trial preparation by Schutzman. Schutzman served a request for discovery and bill of particulars on the Government, filed and argued a number of pre-trial motions, appeared at the Bail Hearing, appeared at two pre-trial conferences and met with Barber on a minimum of three occasions. *See supra* at pp. 365–70.

The performance by Schutzman at trial reflects similar preparation and effort. In the course of this representation, Schutzman gave opening and closing statements, cross-examined Government witnesses at length, elicited testimony from Government witnesses favorable to Barber, called witnesses for the defense, successfully interposed and defended against objections to testimony, successfully argued to exclude physical evidence in the form of narcotics and narcotics paraphernalia, submitted jury instructions which were substantially adopted and moved to have the verdict dismissed pursuant to Fed.R.Crim P. 29. *See supra* at pp. 370–73. In fact, all totalled, Schutzman's examinations, statements and objections comprise almost half—approximately one hundred and fifty-six of the three hundred thirty-seven pages—of the recorded Trial Transcript.

Concerning the argument that Schutzman's conduct prevented Barber from deciding whether to present a defense and whether to testify, the Trial Transcript indicates otherwise. As discussed above, Bar-

ber had ample opportunity to consider and accept a plea prior to trial. *See supra* at pp. 378–80. Regarding trial strategy, Barber insisted Gore be called as witness on Barber's behalf, despite Schutzman's opinion to the contrary. Trial Tr. at 242–43; New Trial Hrg. Tr. at 74, 92. When Schutzman complied with Barber's wishes and called Gore as a witness, Gore invoked the Fifth Amendment and would not testify. *Id.* at 243–46.

As for Barber's own testimony, the record indicates the trial was adjourned early on the second day, 10 October 1992, for the purpose of allowing Barber to consider further whether he should testify. *Id.* at 246–47. By requesting, on the following day, that the court instruct the jury as to how it should view his failure to testify, Barber confirmed that he had made a conscious decision not to testify on his own behalf. *Id.* at 252.

■ In addition to the record establishing that Schutzman's pretrial and trial performance was adequate and effective—even if it was not successful—Barber has not demonstrated he was prejudiced by Schutzman's conduct. The Government's evidence against Barber overwhelmingly indicated Barber had attempted to obtain narcotics from Pakistan, had intended to distribute those narcotics to Gore in Maryland and had engaged in dozens of phone calls to Pakistan and Gore to advance these efforts.[49] Trial Tr. at 330–37. The evidence was so convincing that, despite Schutzman's trial efforts, the jury reached its verdict in less than fifteen minutes, *id.* at 333, and that verdict was affirmed by the Circuit. Appellate Decision at 5–7. In fact, even while maintaining his innocence at the Sentencing Hearing, Barber confirmed his own guilt by stating:

I never did have any drugs to sell or know about drugs. I did a lot of talking on the phone, that's true and *I tried to get drugs from a guy in Pakistan and*

**49.** Barber's own counsel conceded at the Hearing for a New Trial that the evidence against

Barber was overwhelming. New Trial Hrg.Tr. at 104, 106.

*that's true,* but other than that, your Honor, I never did do anything.

Sentencing Tr. at 11–12 (emphasis added).

In light of the above, and given the "strong presumption that counsel's challenged conduct falls within the wide range of reasonable professional assistance," *Reese,* 946 F.2d at 257; *Moore,* 946 F.2d at 246; *Hull,* 932 F.2d at 167; *Gray,* 878 F.2d at 710, it cannot be said that Schutzman's representation of Barber was either deficient or prejudicial. Barber has not demonstrated either that Schutzman's representation fell below an objective standard of reasonableness or that, but for Schutzman's alleged errors, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2065; *see also Kimmelman,* 477 U.S. at 381, 106 S.Ct. at 2586; *Hull,* 932 F.2d at 167. Barber has not demonstrated, therefore, that Schutzman's representation was insufficient under the *Strickland* test. 466 U.S. at 687, 104 S.Ct. at 2064.

Finally, the Supreme Court's warning that "every effort be made to eliminate the distorting effects of hindsight … and to evaluate the conduct from counsel's perspective at the time," *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065, is particularly appropriate in this case. There is no question that Schutzman's and Barber's testimony and sworn statements directly contradict each other. Significantly, however, Schutzman's current representations are consistent with his actions and his representations during the pre-trial and trial period. Both then and now, for instance, Schutzman indicated numerous attempts were made to discuss the case with Barber, particularly the possibility of a plea bargain, but Barber would not consider pleading guilty. In contrast, Barber's current objection to Schutzman's representation is not consistent with his prior conduct. As discussed previously, Barber has failed until now to express a single objection to Schutzman's representation. Indeed, the pre-trial proceedings, the trial, the Sentenc-

ing Hearing and the Appeal all passed without an objection by Barber.[50] When viewed from the time of their occurrence, Schutzman's and Barber's behavior counsel against a finding of ineffective assistance.

C. Evidentiary Hearing Requirement

■ Although a full evidentiary hearing was granted, such a hearing was not required given the extensive case record and the written submissions of the parties.

■ The question of whether to order a hearing on a claim for ineffective assistance is in the discretion of the district court. *Virgin Islands v. Forte,* 865 F.2d 59, 62 (3d Cir.1989). The standard is provided by 28 U.S.C. § 2255. *Forte,* 865 F.2d at 62; *Virgin Islands v. Zepp,* 748 F.2d 125, 133 (3d Cir.1984).

■ Generally, a district court must hold an evidentiary hearing on a claim for ineffective assistance if the defendant has alleged facts which, if proved, would entitle the defendant to relief and an evidentiary hearing is necessary to establish the truth of those allegations. 28 U.S.C. § 2255; *Wells,* 941 F.2d at 259; *Zettlemoyer,* 923 F.2d at 301 (citing *Smith v. Freeman,* 892 F.2d 331, 338 (3d Cir.1989)).

■ To merit a hearing, however, a claim for ineffective assistance of counsel must satisfy both prongs of the *Strickland* test, accepting the veracity of the defendant's allegations. *Wells,* 941 F.2d at 259–60. Mere assertions and conclusory allegations "do not provide sufficient ground to warrant requiring the state to respond to discovery or to require an evidentiary hearing." *Id.* (citing *Mayberry v. Petsock,* 821 F.2d 179, 185 (3d Cir.), *cert. denied,* 484 U.S. 946, 108 S.Ct. 336, 98 L.Ed.2d 362 (1987) and *Barry v. United States,* 528 F.2d 1094, 1101–02 (7th Cir.), *cert. denied,* 429 U.S. 826, 97 S.Ct. 81, 50 L.Ed.2d 88 (1976)).

■ Where the pre-existing record is sufficient to allow determination of an ineffective assistance of counsel claim, an evi-

---

**50.** Along these lines, neither Barber nor his family appear to have filed any ethical charges with the New York State bar against Pugach for unlicensed practice of law. New Trial Hrg.Tr. at 122–23.

dentiary hearing to develop the facts is not required. *United States v. Headley*, 923 F.2d 1079, 1083 (3d Cir.1991); *Zepp*, 748 F.2d at 133; *see also* 28 U.S.C. § 2255 (no evidentiary hearing required when files and records in case conclusively show that prisoner is not entitled to relief).

In this case, no evidentiary hearing was required. The pre-trial and trial record is extensive and conclusively establishes that Barber is not entitled to relief on his claim for ineffective assistance of counsel. In addition, Barber's written submissions do nothing more than make unsupported assertions as to the conduct of Schutzman. Barber submitted no evidence with his motion papers, apart from his own self-serving affidavit, which is barely two double-spaced pages long. No supporting documents or statements from Barber's family, from Pugach or from the trial and pre-trial record were submitted or cited to by Barber to support the assertions in his moving brief.[51] *See* Moving Brief at 1–9. Barber even failed to submit a reply brief.

Barber's conclusory assertions are contradicted by both the record in this case and the affidavits submitted by the Government. It also is observed that Barber's own submissions are, at times, internally inconsistent. For instance, while the Moving Brief states in sweeping terms that "Schutzman *never met* with his client prior to trial," Moving Brief at 7 (emphasis in original), Barber's own affidavit concedes that Schutzman "did appear in court with me before trial." Barber Aff., ¶ 5.

On the basis of the above, Barber was not entitled to an evidentiary hearing on his claim for ineffective assistance, although such a hearing was granted in the interest of providing Barber with fullest due process possible. New Trial Hrg. Tr. at 6.

**51.** The checks submitted into evidence at the Hearing for a New Trial as D1 and D2 were neither mentioned nor attached as exhibits to Barber's written submissions. In any event, these checks are of limited significance. Schutzman testified he knew of these checks and requested payment, in turn, from Pugach.

*Conclusion*

For the reasons set forth above, the Barber motion for a new trial is denied. An order accompanies this opinion.

Nothing has been submitted to suggest that Pugach did not turn these monies over to Schutzman. More significantly, these checks bear no relation to the questions of (1) who, in fact, represented Barber and (2) how effective was Barber's representation.